**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:                                                                          Chapter 11

JPA NO. 111 CO., LTD. and
JPA NO. 48 CO., LTD.,                                             Case No. 21-12075 (DSJ)
                                                                                     (Jointly Administered)

                                           Debtors.
------------------------------------------------------------x

## MEMORANDUM OF DECISION AND ORDER RESOLVING MOTION TO DISMISS


**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
*Counsel for FitzWalter Capital Partners (Financial Trading) Limited*
One Penn Plaza
New York, NY 10019
By:     Eric Winston, Esq.
          Justin Griffin, Esq.

**TOGUT, SEGAL & SEGAL LLP**
*Counsel for Debtors*
One Penn Plaza
New York, NY 10019
By:     Kyle J. Ortiz, Esq.
          Jared Borriello, Esq.
          John McClain, Esq.

**VEDDER PRICE**
*Counsel for JP Lease Products and Services Company Limited*
1633 Broadway, 31st Floor
New York, NY 10019
          Michael J. Edelman, Esq.

**SQUIRE PATTON BOGGS (US) LLP**
*Counsel for Mizuho Leasing*
2550 M Street, NY
Washington, DC 20037
          Christopher J. Giaimo, Esq.

**CLIFFORD CHANCE US LLP**
*Counsel for Sumitomo Mitsui Trust Bank, Limited*
31 West 52nd Street
New York, NY 10019
          Robert Johnson, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion (the "**Motion**" or "**Motion to Dismiss**," ECF No. 22) of FitzWalter Capital Partners (Financial Trading) Limited ("**FitzWalter**") to dismiss two jointly administered, single-debtor bankruptcy cases. The two cases are materially identical. Each case is brought by a Japanese single-purpose entity (respectively, JPA No. 111 Co., Ltd., and JPA No. 49 Co., Ltd., referred to in this Opinion generically as "**JPA**" or "**Debtors**"). Each Debtor is wholly-owned and controlled by the same parent, JP Lease Products & Services Co. Ltd., a Japanese company (referred to as "**JP Lease**" or "**JPL**"). Each Debtor purchased and owned one Airbus A350-941 aircraft, which each Debtor indirectly leased (through an intermediate lessee-lessor entity) to Vietnam Airlines ("**VNA**"). Each Debtor's cash flow sharply decreased along with the collapse of air travel during the COVID pandemic. In December 2021, FitzWalter, which had only recently acquired substantial amounts of JPA debt and assumed the role of "Security Agent" under the relevant financing agreements, began seeking foreclosure remedies in England as to JPA's contractual entitlements known as "Lease Assets"; FitzWalter has not commenced foreclosure proceedings against the airplanes themselves. Upon discovering FitzWalter's foreclosure attempt, Debtors filed Chapter 11 bankruptcy petitions in this Court.

FitzWalter's Motion asserts three grounds for dismissal: first, that each Debtor lacks any legally meaningful ties to the United States and therefore may not be a debtor in a U.S. bankruptcy proceeding under 11 U.S.C. § 109; second, that the petitions were filed in bad faith as improper efforts to forestall legitimate and contractually specified foreclosure remedies available to FitzWalter, warranting dismissal pursuant to 11 U.S.C. § 1112(b); and, third and alternatively, that the Court should abstain under 11 U.S.C. § 305(a)(1). Debtors oppose, supported by their parent JPL and by two holders of secured debt, all of whom argue that FitzWalter is engaging in

value-destructive enforcement efforts that will fail to compensate or satisfy the entitlements of other holders of debt, unsecured creditors, and equity holders, notwithstanding that (in the Motion opponents' view) a full-payment outcome can be achieved by selling Debtors' assets under the auspices of Debtors' Chapter 11 cases.

For reasons detailed below, the Motion is denied. Briefly, each Debtor satisfies the eligibility requirements of section 109 because each owns "property" in the United States in the form of an interest in a retainer deposit held in the bank account of Debtors' counsel. And, having considered substantial briefing, written evidence, and testimony during an all-day evidentiary hearing conducted on January 26, the Court concludes that Debtors are in good faith using Chapter 11 processes to attempt to maximize creditor (and potentially equity holder) recoveries through a contemplated Section 363 sale to an already-identified stalking horse bidder, subject to higher and better offers, in the face of an unwanted effort by FitzWalter to pursue a fast-track foreclosure and sale of a subset of each Debtor's assets that Debtors and supporting parties believe is unlikely to maximize recoveries of all creditors and parties in interest. FitzWalter rightly emphasizes that many of the so-called *C-TC* factors[1] that courts use to assess whether a filing was made in bad faith point in favor of dismissal, but the overall circumstances here do not demonstrate a bad-faith effort to improperly delay and frustrate the legitimate expectations of a secured creditor.

## BACKGROUND

The Court has considered the record as a whole of the two bankruptcy cases; the parties' written submissions in connection with the Motion, which are listed in an Agenda docketed at ECF No. 85; and the record of a January 26 hearing on the Motion, including argument of counsel, 103

---

[1] *See In re C-TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997).

exhibits subject to certain exclusions stated on the hearing's record (referred to as "**JX __**" corresponding to an exhibit list provided by counsel at the hearing, a copy of which is docketed at ECF No. 88), and expert and fact witness testimony. The Court received the transcript of the January 26 hearing only on January 31, but it is nevertheless issuing this Opinion without delay and without comprehensively detailing all record evidence, given the reported time sensitivity of Debtors' efforts to proceed with a prompt asset sale to identified proposed purchasers[2] (the "**Stalking Horse Bidders**," sometimes referred to collectively as the "**Stalking Horse Bidder**"). This Opinion reviews the case's overall background, drawing in part from pleadings that were not admitted into the evidentiary hearing record. Its Discussion section then includes findings of fact as well as conclusions of law resulting from the January 26 hearing.

### A. The Formation, Characteristics, and Ownership of JPA Entities

The Debtors are special purpose vehicles each formed, under Japanese Law, for the purpose of acquiring and leasing an Airbus A350 aircraft. [ECF No. 3 ("**First Day Declaration**" or "**FDD**") ¶ 10]. Both Debtors are wholly-owned and managed by JPL. [*Id.* ¶ 10, Ex. A]. The Debtors have no employees and are managed by Teiji Ishikawa, the President and CEO of JPL and "Representative Director" of each Debtor, or indirectly through employees of non-debtor affiliates acting under Ishikawa's direction. [*Id.* ¶ 11]. Debtors do not have any independent offices, and JPL maintains an office in Tokyo, Japan. [*Id.* ¶ 10, n. 2., Exs. C, H].

Debtor JPA No. 111 Co., Ltd. was formed in December 2017 to acquire an Airbus A350-941 aircraft with serial number 067; Debtor JPA No. 49 Co., Ltd. was formed in August 2017 to acquire an Airbus A350-941 aircraft with serial number 173. [*Id.* ¶12]. Upon closing of

---

[2] The Debtors have identified the Stalking Horse Bidders as Capitol Reef LLC and Isle Royale LLC. [ECF No. 21 ¶ 18].

the aircraft financings, each Debtor acquired its respective aircraft, which each retail for over $150 million, using various interwoven debt financing and equity financing arrangements. [*Id.*].

Each Debtor leases its aircraft to an intermediate lessor, which in turn subleases the aircraft to VNA. [*Id.* ¶¶ 13–14, Ex. A]. VNA's lease payments are used by the Debtors to repay the debts outstanding under their financing arrangements (set forth in more detail below). [*Id.* ¶ 14]. VNA currently operates the aircraft actively and pays substantially all operating expenses. [*Id.* ¶ 15]. Prior to the Petition Date, the Debtors were negotiating with VNA to restructure their lease arrangements. [*Id.*].

### B. Financing of JPA Entities

To finance their acquisitions of each Aircraft, each Debtor entered into a complex set of financing arrangements with various lenders, agents, and other parties specific to each aircraft (collectively, the "**Transaction Documents**"). [*Id.* ¶ 19]. Each Debtor is financed by both senior and junior loan facilities. Debtor JPA No. 111 entered into senior and junior facility agreements providing for total committed loans up to $100 million and $15 million, respectively; Debtor JPA No. 49 entered into senior and junior facilities providing for total commitments of up to $111 million and $7.3 million, respectively. [*Id.* ¶¶ 20–22].

In connection with these debt financings, each Debtor entered into a substantially identical proceeds agreement with their intermediate lessors, JPL, Credit Agricole Corporate & Investment Bank ("**CACIB**"), and the various lenders. [*Id.* ¶ 22; ECF No. 23 Exs. 7, 14, JX 8, 15 (the "**Proceeds Agreements**")]. The Proceeds Agreements, *inter alia*, require each Debtor to lease the aircraft to the applicable intermediate lessor who is in turn required to sublease them to VNA (with VNA's rent payments intended to fully cover all Debtors' obligations to its secured lenders); prohibits JPL from putting the Debtors into bankruptcy; provide for a "Security Agent" (then,

CACIB) to act on behalf of the lenders; and contain a payment waterfall for distribution of all proceeds received by the Debtors, pre- or post- default.  [*See* Proceeds Agr. §§ 3, 8; FDD ¶ 22].

To secure these obligations, the Debtors granted the Security Agent liens on the aircraft pursuant to the aircraft mortgages [ECF No. 23 Exs. 11, 18, JX 12, 19 (the "**Aircraft Mortgages**")], and assigned the Security Agent interests in its rights under the Transaction Documents, including the various leases, pursuant to the security agreements [ECF No. 23 Exs. 10, 17, JX 11, 18 (the "**Security Agreements**")].  The Aircraft Mortgages are governed by New York law and contain a New York forum selection clause, and the Security Agreements are governed by English law.  [Aircraft Mortgage § 12; Security Agr. § 19].  The Aircraft Mortgages give the Security Agent and mortgagee enforcement remedies upon a default, including a foreclosure sale governed by the New York UCC.  [§ 6; *see* Motion at 10].  The Security Agreements give the Security Agent enforcement rights as to the applicable interests under the Transaction Documents including the right to "dispose of" such property "at the times, in the manner and on the terms it thinks fit[.]" [Security Agr. § 6].  The parties and this Opinion refer to these interests as the "**Lease Assets**").

### C. Cash Flow Difficulties Related to COVID-Associated Air Traffic Reductions; Default and Lease Terminations

Prior to the COVID-19 pandemic, Vietnam Airlines was current on its lease obligations, but since the outbreak has experienced ongoing financial challenges.  [FDD ¶ 26].  Thus, in April and October 2020 the intermediate lessors and VNA agreed to rent deferrals, the most recent and controlling of which provided for reduced rent for April – December 2020 and for VNA to pay the deferred rent in 18 equal monthly installments beginning in January 2021.  [*Id.* ¶ 27].  In 2021, VNA made payments averaging approximately $500,000 per month, but has not paid its full rent obligations.  [ECF No. 53-1, JX 59 ¶ 21].  As noted, the parties have been negotiating long-term

amendments to the leases and subleases, which would (according to the Debtors) extend their term and provide for reduced rent payments that would step up to full rent over time. [FDD ¶ 28].

On December 1, 2021, CACIB as (then) Security Agent notified the Debtors, intermediate lessors, and VNA that defaults had occurred under the leases and subleases, and the Security Agent terminated such leases and subleases. [Motion at 8].

### D. FitzWalter's Acquisition of Secured Debt, Assumption of Role as Security Agent, and Immediate Commencement of Foreclosure Actions as to Lease Assets

Also on December 1, 2021, FitzWalter acquired $128,227,903.53 in outstanding obligations issued by Debtors: $115,778,525.00 in senior loans and $12,449,378.53 in a secured claim relating to the termination of certain swap obligations arising in connection with the Transaction Documents. [Motion at 9]. The next day, FitzWalter succeeded CACIB as Security Agent under the Transaction Documents. [*Id.*].

On December 10, 2021, FitzWalter appointed Airborne Capital Limited ("**Airborne**") to conduct a sale of the Lease Assets, which FitzWalter contends were wholly and absolutely assigned to it under the Security Agreements. [*Id.* at 6, 9]. FitzWalter did not notify the Debtors of the foreclosure sale. [FDD ¶ 29]. The procedures for this proposed sale were entered as an exhibit during the hearing and provided for, among other things, a bid deadline of December 17 at 4:00 p.m., a deadline for the successful bidder to fund the purchase price of December 17 at midnight, and a closing date of December 20. [JX 94 at 4]. As of December 17, FitzWalter had not commenced any foreclosure action against the aircraft themselves, and stated that any such effort would involve a separate foreclosure process with separate procedures, different timelines, and different advertisements. [Motion at 10].

### E. Debtors' Commencement of Chapter 11 Cases, and Debtors' Attempt to Proceed with a Court-Supervised Sale of Substantially All Debtors' Assets

On December 17, 2021, the Debtors filed these Chapter 11 cases to trigger an automatic stay of FitzWalter's foreclosure sale, which Debtors contend would artificially deflate the price of the Debtors' assets and harm the Debtors and their creditors and equity holders; Debtors further contend that the foreclosure sale was designed to benefit FitzWalter, prevent Debtors or JPL from bidding, and ensure that FitzWalter affiliates would emerge as prevailing asset purchasers at a low purchase price. [FDD ¶¶ 9, 37; Debtor's Opp. ¶ 5]. Debtors state that they intend to market and sell the Lease Assets and the aircraft under Court supervision pursuant to 11 U.S.C. § 363, arguing such a sale would yield greater recovery for, and/or benefit to, all parties in interest. [FDD ¶¶ 38–40; Debtors' Opp. ¶¶ 6–7].

On December 31, 2021, the Debtors filed a motion for Court approval of, *inter alia*, bidding procedures for the sale of substantially all of the Debtors' assets under § 363, specified Stalking Horse Bidders, and bid protections. [ECF No. 21, JX 51 (the "**Bid Procedures Motion**")]. The Debtors proposed, among other things, a purchase price that Debtors characterize as full payment of all secured obligations (although FitzWalter later objected that not all asserted secured-lender entitlements are included), plus $5 million cash for recovery to the equity interest holder, JPL. [*See id.* ¶ 20]. Debtors argue that selling the Lease Assets and aircraft together would maximize their value and lead to greater recovery for all parties in interest. [*Id.* ¶ 49].

### F. FitzWalter's Motion to Dismiss

On January 2, 2022, FitzWalter filed its Motion to dismiss these cases. [ECF No. 22]. The Motion alleges, among other things, the following. After the leases were terminated on December 1, 2021, VNA had no right to fly the aircraft but nevertheless has continued to do so, resulting in diminution of the Aircraft's value. [*Id.* at 8–9]. Moreover, FitzWalter as Security

Agent owns all the Lease Assets, including any damages claims against Vietnam Airlines, and Debtors have only contingent reversionary interests in such Lease Assets after all secured loans are paid in full. [*Id.*]. FitzWalter contends that Debtors filed these cases, in violation of § 3.1.3 of the Proceeds Agreements, to prevent FitzWalter from exercising its contracted-for remedies over the Lease Assets, assets that are not properly part of the Debtors' bankruptcy estates—and, in short, the Debtors seek to sell assets they do not own. [*Id.* at 10–12].

The Motion argues, among other things, as follows in support of dismissal or abstention. The Debtors are ineligible for bankruptcy protection under §109 because the retainers on which Debtors rely to establish eligibility were paid by JPL, and thus are not property interests of the Debtors, and none of their other assets are located in the United States. [*Id.* at 13–14]. Further, "cause" exists to dismiss the case under § 1112(b) because the cases were filed in bad faith. [*Id.* at 14–28]. Specifically, application of the *C-TC* factors shows that the Debtors filed their cases with subjective bad faith, [*id.* at 16–19 (citing, *inter alia*, *C-TC* and *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576 (Bankr. S.D.N.Y. 2018)], and Debtors' filing is objectively futile because they have no prospect for reorganization (having no business to reorganize) and no reorganizational purpose, and the Debtors do not seek a discharge. [*Id.* at 25–27]. Finally, in the alternative, the Court should abstain from hearing the cases under 11 U.S.C. § 305 because, among other things, the Proceeds Agreements already provide for an alternative means of equitably distributing the assets more economically and efficiently than through the Bankruptcy Code, especially considering the Debtors' and their creditors' lack of ties to the U.S. [*Id.* at 28–30].

On January 13, Debtors filed their opposition to the Motion. [ECF No. 53]. Two secured creditors joined in the Debtors' Opposition to the Motion to Dismiss and in support of the Bid Procedures Motion [ECF Nos. 51 and 54], as did JPL [ECF No. 55]. On January 18, FitzWalter

filed its reply to the Debtors' Opposition. [ECF No. 67 ("**FitzWalter Reply**")]. Following discovery and the filing of additional pleadings, declarations, and exhibits, the Court heard argument and conducted an evidentiary hearing on the Motion to Dismiss on January 26, and reserved judgment. As noted, the Court's key factual findings resulting from the January 26 hearing are detailed and discussed within this Opinion's Discussion section, *infra.*

## DISCUSSION

### I.     Jurisdiction

As the parties do not dispute, the Court has jurisdiction over bankruptcy cases filed in this District pursuant to statute and the standing order of reference to this Court of all cases commenced under title 11 and all proceedings arising under title 11 or arising in or related to a case under title 11. *See* 28 U.S.C. §§ 157, 1334; *Amended Standing Order of Reference M-431,* dated January 31, 2020 (Preska, C.J.). Consideration of the Motion is a matter concerning the administration of the estate, and therefore is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A).

### II.    Debtors Have Property in the United States and Therefore "May Be a Debtor" Under Title 11

FitzWalter first argues that dismissal is required because Debtors assertedly do not meet the eligibility requirements of section 109 of the Bankruptcy Code, namely, that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title." 11 U.S.C. § 109(a).

FitzWalter is correct that Debtors have few ties to the United States. They are Japanese companies; they have no offices or employees here (or anywhere); they have no regular operations and do no ordinary-course business here; they lease their airplanes to a foreign carrier; and the airplanes that they own have never flown to or been in the United States.

Nevertheless, Debtors meet the requirements of Section 109 because they "ha[ve] . . . property in the United States," in the form of entitlements associated with separate retainer deposits, one for each Debtor and each in the amount of $250,000, that are in accounts established by their U.S. bankruptcy counsel for the purpose of funding legal services in connection with Debtors' bankruptcy proceedings here. [*See* Debtors' Opposition to Motion to Dismiss ("**Debtors' Opposition**"), ECF No. 53, JX 87 ¶¶ 11–15, Ex. B; ECF No. 75, Exs. B and C]. Moreover, any unused funds contained in the retainer accounts are contractually required to be returned to Debtors. [Hearing Tr. at 50:11–18; *see* ECF No. 75, ¶ 17 and Exs. B and C[3]].

For a foreign corporation to qualify as a debtor under Section 109, courts have required "only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate debtors' bankruptcy proceedings." *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 249 (S.D.N.Y. 2004). Further, the statute unqualifiedly uses the word "property" without any minimum value requirement, and courts agree that "there is no statutory requirement as to the property's minimum value." *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002).

Consistent with these general considerations, funds that are held in the United States to pay for law firm services for a debtor constitute a debtor's property that is located in the United States, and that thus satisfy the requirements of Section 109. *See, e.g.*, *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 268 (Bankr. S.D.N.Y. 2019) ("Courts in this Circuit have held

---

[3] This citation is to the retention application of Debtor's counsel, filed 6 days before the hearing. [ECF No. 75]. Although not received in evidence at the hearing, the application and exhibits thereto corroborate Debtors' counsel's statement at the hearing that any portions of the retainers undrawn at the end of this case are to be returned to the Debtors (not JPL).

that Section 109(a) can be satisfied by bank accounts in the United States, including by an undrawn retainer."); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) (same).

FitzWalter does not contest the legal proposition that interests in legal retainers can constitute property in satisfaction of section 109's requirements. Rather, FitzWalter observes that the transfer of funds to Debtors' counsel was made directly by Debtors' parent entity, non-debtor JPL, which FitzWalter contends renders the deposits not Debtor property. FitzWalter further objects that Debtors have not established their entitlements to the escrow deposits by competent evidence, particularly given that Debtors' petitions or schedules do not list the law firm escrow balances as assets, which FitzWalter contends should be deemed a binding admission of a lack of this form of U.S. property.

FitzWalter's objections are not well taken. First, it is of no moment that JPL directly transferred the escrowed funds. The record corroborates Debtors' counsel's receipt of the funds for purposes of paying for legal services to be rendered to Debtors in these bankruptcy cases, and that Debtors are entitled to the return of any unused funds at the end of the representation. [Hearing Tr. at 50:11–18; *see* ECF No. 75, ¶ 17 and Exs. B and C]. And the existence of funds from which a client is entitled to fund U.S. legal services is sufficient to satisfy Section 109, whoever sent the funds to counsel. *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) ("The retainers were paid on behalf of all the Debtors and, therefore, all the Debtors have an interest in those funds. It is not relevant who paid the retainer, so long as the retainer is meant to cover the fees of the attorneys for all the Debtors, as it clearly was in these cases"); *cf.* 2 Collier on Bankruptcy ("**Collier**") ¶ 109.02 ("the debtors' interests in the unearned portions of retainers paid to their U.S. counsel were property of the debtors' estates and constituted property in the United States that rendered all of the debtors eligible"); *In re Indep. Eng'g Co., Inc.*, 232 B.R. 529

(B.A.P. 1st Cir.), *aff'd*, 197 F.3d 13 (1st Cir. 1999) (corporate debtor held property interest in unearned portion of the retainer paid to debtor's attorney by debtor's principal, where unearned portion of the retainer would be returned to debtor; retainer was thus property of the estate).

The Court rejects FitzWalter's contention that Debtors have failed to present evidence to corroborate that they have a property interest in the form of U.S. deposits of funds to pay Debtors' counsel here. The evidentiary record of the January 26 hearing includes a receipt of the wire transfers and the funds transfer confirmation for the retainers [*see* Debtors' Opp. Ex. B; JX 98], and FitzWalter has not challenged the accuracy or truthfulness of Debtors' evidence and explicit representation that two $250,000 deposits existed as of December 17, 2021, the date these cases were filed (the "**Petition Date**"), to fund each Debtor's bankruptcy legal fees. Further, the Court declines to hold that the omission of these fee deposits from Debtors' petitions or schedules compels the conclusion that no such property interest exists. To do so would be to improperly elevate form over substance where the evidence establishes the existence of U.S.-based property, especially because, if necessary, the Court could and would be inclined to allow an amendment of Debtors' schedules, a concept that Debtors' counsel embraced during the January 26 hearing. [Hearing Tr. 49:1–25].

The Court acknowledges but does not decide a second and independent theory advanced by Debtors as to why they satisfy section 109, namely that they possess another qualifying property interest in the form of "contract rights" to have a New York forum apply New York law to any disputes under aircraft mortgages to which they are a party. [Debtors' Opp. ¶ 16 (citing *In re Berau Capital Res. PTE Ltd.*, 540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015))]. FitzWalter does not dispute that contractual choice of law and forum selection provisions can give rise to property rights that are estate property, but FitzWalter argues that the situs of any such property interest of

Debtors is in Japan, not the United States. [*See* FitzWalter Reply at 6–8; Hearing Tr. at 29:21–30:1]. The Court need not and does not decide the disputed situs of the property interest arising from the forum selection clauses in light of its holding based on the fee deposits in New York that are used to fund Debtors' legal representation in these cases.

### III. Dismissal on Grounds of Bad Faith Pursuant to Section 1112(b)

#### 1. Findings of Fact

The Court finds the following facts that are particularly significant to its holding that the petition should not be dismissed as a bad-faith filing:

At all relevant times prior to December 2021, each JPA entity owned one commercial airplane, and received lease revenues from an intermediate lessor entity which in turn received lease payments from VNA. Each JPA entity was fully owned by JPL, had no employees or physical location independent of JPL, and existed solely to own and lease its respective Airbus A350. Each JPA entity's assets included lease payment and other contractual rights associated with its ownership of the aircraft, referred to as "Lease Assets," as well as the aircraft itself.

Prior to the COVID pandemic, VNA met all or essentially all its lease payment obligations on the JPA-owned aircraft that it leased. VNA's operations and revenues were severely affected by the pandemic, and VNA was unable to meet its scheduled lease payment obligations, although record evidence including the testimony of Heinrich Loechteken credibly established that VNA paid, on average, approximately $500,000 per month toward its lease obligations for at least a portion of the last two years. [ECF No. 53-1, JX 59 ¶ 21; *see* Hearing Tr. at 169:19–170:10, and JX 82 ("**Loechteken Depo. Tr.**") at 34:16–35:3]. Again based on the testimony of Mr. Loechteken, which I credit, JPA considered it commercially important to maintain its relationship with VNA and to attempt to restructure the lease obligations as VNA restored operations and

regained revenue, particularly because the commercial market for widebody aircraft was extremely "soft," the costs of repossessing and storing the aircraft and associated paperwork would be high with significant challenges to enforcement actions against VNA and/or the aircraft, and the prospects of negotiating a sufficiently lucrative replacement lease or sale of the aircraft were poor. [*See* Hearing Tr. at 166:1–171:10; ECF No. 53-1, JX 59 ¶¶ 12–24]. JPA and its parent JPL wished to pursue this strategy not only as to the two leases of the Debtors, but also as to a third Airbus owned by a third, non-debtor JPA entity that is also leased to VNA.

The Debtors are financed by two tiers of secured debt. Their credit facility involved the participation of a senior majority lender, termed the "Security Agent" under governing agreements, who was contractually authorized to act on behalf of all holders of secured debt of the JPA enterprises at issue. Debtors have represented, and FitzWalter has not contested, that the Security Agent does not owe fiduciary duties to other lenders or any other party in the transactions. Until early December 2021, CACIB served as Security Agent. The distribution of revenues or other financial recoveries, including upon enforcement action or termination of the leases, was governed by the applicable Proceeds Agreement, which among other things specified a payment "waterfall" or priority scheme of distributions to participating lenders, including a senior and a junior class of secured lenders. [Proceeds Agr. §§ 2, 8.3].

Under the relevant Security Agreements, the Debtors assigned security interests (discussed in greater detail below) in all the Debtors' rights under the various "Transaction Documents," including the "Lease Assets" (again, entitlements in connection with the lease of each aircraft), to the Security Agent (in its capacity as security agent on behalf of all secured lenders). [*See* Security Agr. § 3]. The secured lenders, via the Security Agent, had contractually specified enforcement rights in the event of a default. Specifically, again acting by and through the Security Agent, they

were entitled under the Security Agreements to seek foreclosure remedies in England with respect to the Lease Assets [*see* Security Agr. § 6], and they were entitled under the Aircraft Mortgages (which were subject to New York law and a New York forum selection clause) to seek foreclosure remedies[4] with respect to the aircraft themselves (albeit under different terms and pursuant to separate requirements) [*see* Aircraft Mortgage § 6].

In early December 2021, FitzWalter acquired a substantial share of the secured JPA debt that had been issued by the two Debtor entities in this case, and succeeded CACIB as Security Agent. [*See, e.g.*, Motion at 9]. On December 1, 2021, the day before FitzWalter took over its role as Security Agent, CACIB as (then) Security Agent declared a default on the relevant debt and leases, terminated the leases, and directed that future payments be made directly to it. [*See, e.g.*, Gray Decl. Exs. 31 and 32; ECF No. 80-1, 80-2, JX 39, 40]. CACIB also sold at least the majority of the secured debt of the two JPA entities to FitzWalter, which then became Security Agent. [*See* Gray Decl. ¶¶ 76–80]. All of these steps were consistent with the secured lenders' contractual entitlements and the procedures set forth in the governing agreements.

On December 10, 2021, FitzWalter took steps to commence a foreclosure process in England against the JPA entities' "Lease Assets," but not the aircraft themselves. [Gray Decl. ¶¶ 81–83]. FitzWalter did not notify JPA of its pursuit of foreclosure remedies. [Hearing Tr. at 231:9–23]. FitzWalter retained a firm with experience in the aviation industry, Airborne Capital Limited ("**Airborne**"), to serve as its agent in pursuing remedies with respect to the defaulted debt.

---

[4] FitzWalter states in its Motion, with respect to a foreclosure sale of the aircraft, that "the sales process for the Lease Assets that Airborne had commenced did not include a sale of the Aircraft. The sale of the Aircraft would involve a separate foreclosure process *pursuant to the New York Uniform Commercial Code*, which requires the sale be 'commercially reasonable.' A sale of the Aircraft would necessarily require separate procedures, different timelines and advertisements that would be appropriate for the sale of an airplane (as opposed to the sale of contractual rights)." [Motion at 10 (citations omitted) (emphasis added)].

[*See, e.g.*, Gray Decl. ¶ 81]. Again, these steps have not been alleged to be inconsistent with FitzWalter's contractual entitlements in its capacity as Security Agent or a holder of secured JPA debt.

On a date that is disputed but, based on an early-morning email dated December 14, appears likely to have been December 13 and no later than early on December 14, 2021, the JPA entities became aware through industry press of ongoing efforts to sell their aircraft and/or take foreclosure action or seek other remedies affecting them. [*See* JX 100, corroborated generally by testimony of Heinrich Loechteken]. They promptly made inquiries and attempted to determine an appropriate course of action. They did not initiate discussions with FitzWalter even after learning that FitzWalter had commenced a foreclosure and sale process with respect to the Lease Assets. Mr. Loechteken testified credibly that in his view and that of JPL leadership with whom he was working, FitzWalter was engaged in an expedited, value-destroying, likely self-serving course of action, he believed intended to permit a FitzWalter affiliate to emerge with control of JPA's assets at a suppressed price, such that any bid by JPA or JPL through the process being run by FitzWalter was doomed to fail. [*See* Hearing Tr. at 164:16–167:13, 260:4–261:15]. The Court credits Mr. Loechteken's testimony concerning his and JPL's reasoning, but does not make an affirmative finding regarding FitzWalter's commercial motivations because Mr. Loechteken's testimony, while plausible, is speculative and not backed by concessions from any FitzWalter source.

As noted, both JPA Debtor entities filed Chapter 11 petitions in this Court on December 17, 2021. As of the Petition Date, FitzWalter had begun but had not completed a foreclosure process in England as to the JPA Lease Assets, and no foreclosure action had been commenced as against the two JPA-owned aircraft themselves. Under the Proceeds Agreements, JPL had contractually agreed not to file or direct the filing of bankruptcies by the JPA entities [*see* Proceeds Agr. § 3.1.3],

and, given JPL's actions in support of the JPA entities' filing here, JPL appears to have acted inconsistently with that contractual provision, unless some consideration renders that limitation inapplicable—a question that this Court need not and does not reach.

On December 31, 2021, JPA filed a motion seeking approval of bid procedures and a Stalking Horse Bidder that has committed to buy substantially all of the JPA Debtors' assets for the total amount due on account of the two JPA entities' secured debt (although FitzWalter objects that not all obligations on account of the security agreements are included), plus $5 million. [*See* ECF No. 21]. I credit Mr. Loechteken's testimony that this proposed transaction, if finalized, will represent the realization of JPA's strategy of maximizing value and recoveries, in anticipation of reinstating its relationship with VNA and restructuring financial arrangements based on anticipated improved future VNA lease revenues. [*See, e.g.*, Hearing Tr. at 115:1–120:1, 170:18–173:1; ECF No. 53-1, JX 59 ¶¶ 13–24]. I further credit Mr. Loechteken's testimony and JPA's contention that, in his and in JPA's judgment, this strategy is the most reliable way to maximize recoveries for all parties in interest, and that, by contrast, FitzWalter's approach appears likely to realize a lower total recovery, and to come at the expense of other secured creditors and other parties in interest. [*See* Hearing Tr. at 164:16–167:13, 260:4–261:15; ECF No. 53-1, JX 59 ¶¶ 13–24]. Two secured creditors as well as JPL have filed joinders to JPA's opposition to the Motion and its request to proceed with an asset sale [ECF Nos. 51, 54, and 55], lending credence to JPA's contentions and Mr. Loechteken's testimony. And FitzWalter could have, but did not, present evidence concerning the likely total return on its intended foreclosure sale of the Lease Assets, nor did it present evidence regarding the likely outcome of any eventual foreclosure proceeding or other remedy it envisioned as to the aircraft, lending further credence to, at least, the plausibility of JPA's suspicions about FitzWalter's course of conduct.

At bottom, the Court finds that JPA's bankruptcy petition was filed in a subjectively good-faith effort to maximize recoveries of all stakeholders by making the best of a difficult commercial situation. Indeed, the term sheet between JPA and its Stalking Horse Bidder set consideration on the proposed asset sale in the amount necessary to satisfy at least the bulk of the Debtors' obligations to their secured creditors, plus $5 million cash [*see* ECF No. 21 Ex. B, JX 54 ("**Term Sheet**") § 3; Bid Procedures Motion ¶ 20, n. 5], which, although disputes will remain, guards against a possible ultimate shortfall in funds available to satisfy secured claims, and which appears likely to constitute a monetarily superior outcome when compared to the likely outcome of FitzWalter's foreclosure process. The Court further finds that FitzWalter, although acting consistently with its contractual entitlements, is not contractually restrained from pursuing a course that will yield a lesser recovery that is likely to harm parties other than itself; nor has FitzWalter presented evidence challenging JPA's testimony that JPA's preferred approach will yield a superior financial outcome compared to FitzWalter's. Finally, while JPA plausibly argues that FitzWalter is motivated by an intention to divide estate assets and cause depressed-price sales to be made to FitzWalter affiliates that will reap a windfall, the Court makes no finding with respect to FitzWalter's subjective intent, as the evidentiary basis for such a conclusion does not include direct evidence from FitzWalter employees or agents, and no factual finding about FitzWalter's subjective intentions is required to support the Court's conclusions herein.

FitzWalter and JPA each presented expert testimony concerning English law and the nature of the security interest held by FitzWalter [*see* ECF No. 79, JX 68; ECF No. 68 Ex. A., JX 91], in light of a contention by FitzWalter that JPA's proposed Section 363 sale cannot go forward because the Lease Assets have been absolutely assigned to the Security Agent and other secured debtholders, such that the Lease Assets are not estate property capable of being sold [*see, e.g.,*

Motion at 20–21]. The Court found the testimony of each side's expert—respectively, Akhil Shah on behalf of FitzWalter and Francis Tregear on behalf of JPA—helpful, informed, credible, and largely consistent except on the debatable legal question of whether the Lease Assets have been absolutely assigned to secured creditors, or rather whether, in English legal parlance, those assets are merely subject to a security interest known as a "charge." The Court declines to find whether an absolute assignment or a mere "charge" was effected under the governing agreements, because no such finding is necessary to resolve the dispute before the Court. Mr. Shah acknowledged (and Mr. Tregear agreed) that, at a minimum, JPA possesses an "equity of redemption," meaning roughly speaking an equitable right to redeem and recover the pledged or assigned property upon repayment of the secured debt; and Mr. Shah explicitly acknowledged that JPA possessed this equity of redemption both on the Petition Date, and now. [Hearing Tr. at 109:20–111:7, 204:5–206:11, 211:8–212:7]. Thus, as a matter of bankruptcy law which was not the subject of the English law experts' testimony, there can be no serious dispute that JPA's equity of redemption constitutes property of the estate under Bankruptcy Code section 541, which, as such, can be included in an asset sale.

Further, the Term Sheet supporting JPA's proposed asset sale states that what is being sold is all of JPA's right, title and interest associated with the aircraft—which, even if limited to the aircraft and JPA's equity of redemption with respect to the Lease Assets, remains conveyable estate property appear sufficient to permit the completion of the proposed sale.[5] Accordingly, the

---

[5] During the hearing, FitzWalter elicited testimony suggesting that rights as against VNA are held directly by the non-debtor intermediate lessor entities, not JPA, such that JPA may not even directly own the "equity of inclusion" that both retained English-law experts agree accompany even an absolute assignment by way of security. [*See, e.g.*, Hearing Tr. at 231:18–232:7]. This consideration, however, does not mean that JPA has no pertinent rights that can be conveyed or exercised, as is confirmed by the terms of the Stalking Horse Term Sheet providing that the bidder will fully satisfy JPA's secured debt and pay an additional $5 million in cash upon the transaction's close, in exchange for all of Debtors' right, title, and interest in property

Court finds that the evidence contradicts FitzWalter's contention that JPA's proposed course of action depends on a purported sale of property that it does not own, and therefore cannot be a good faith course of conduct.

Finally, a further development, although not relied upon by the Court as a basis for the factual findings outlined above because it occurred after the hearing's close, provides additional reassurance that the course proposed by JPA remains potentially viable and, at a minimum, a good-faith effort to maximize value for all parties in interest. At the conclusion of the January 26 hearing, during which the parties' contentions and the nature of JPA's property interests were thoroughly reviewed, the Court asked JPA to inform the Court whether the Stalking Horse Bidder remained committed to go forward with the transaction it had negotiated, or some variation thereof. The Court commented that, if the Stalking Horse Bidder determined that the hearing revealed facts or considerations that made the Stalking Horse Bidder unwilling to proceed, the Court wished to be informed because that might affect its assessment of the viability of Debtors' plan to proceed with a prompt Section 363 asset sale to achieve prompt payment to creditors to the greatest extent possible. On January 28, 2022, Debtors filed a statement in response, reporting among other things that the Stalking Horse Bidder "has reaffirmed to the Debtors" its support of JPA's proposed transaction, and represents that it will "complete the purchase of the Purchased Assets" if it prevails in the auction contemplated by the Bid Procedures Motion. [ECF No. 90]. The same statement also "confirmed" that the negotiated purchase consideration is worded such that it will cover the amount of all secured claims against the JPA estates, plus $5 million in cash. [*Id.*]. FitzWalter filed a response that raised numerous criticisms of JPA's statement and, specifically, objected that

relating to the aircraft—without precisely defining what that "right, title, and interest" consists of. [*See* Term Sheet §§ 1–3].

the Stalking Horse Bidder's commitment did not cover all entitlements that FitzWalter asserts are due on account of security interests and associated entitlements. [ECF No. 91]. FitzWalter's response, which like JPA's post-hearing statement is not part of the hearing's record, fails to identify a reason that the bankruptcy proceeding is "objectively futile" or subjectively in bad faith, and instead foreshadows a dispute that likely will need to be addressed as the case progresses.

## 2. Legal Analysis

Upon motion by a party in interest, a court shall dismiss a chapter 11 case or convert it to chapter 7, "whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b).[6] Broadly speaking, this provision guards against abusive bankruptcy filings and unjustified harms that might otherwise flow from the commencement of a bankruptcy case. As the Second Circuit has put it, "When it is clear that, from the date of the filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous." *In re C-TC*, 113 F.3d at 1310 (citing *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991)). Further, "'an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally— the debtor must have some intention of reorganizing.'" *In re C-TC*, 113 F.3d at 1310 (quoting *In re Cohoes*, 931 F.2d at 227). Thus, in this Circuit, "a bankruptcy petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found." *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997); *In re AAGS Holdings*, 608 B.R. at 384 (same).

---

[6] Unless the court appoints a chapter 11 trustee under section 1104 or a statutorily specified exception applies. 7 Collier ¶ 1112.04.

The Code explains that "the term 'cause' includes" the circumstances listed in the subparts of section 1112(b)(4). Those listed grounds do not identify "bad faith" as constituting "cause," but the statutory list is illustrative and not exhaustive; a finding that a case was filed in bad faith supports a dismissal for cause under section 1112(b). *See, e.g.*, *In re AAGS Holdings LLC*, 608 B.R. 373, 382 (Bankr. S.D.N.Y. 2019). A case is filed in bad faith "if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *Id.* (cleaned up). And, as noted above, particularly in single asset cases, courts refer to the *C-TC* factors to assess whether a Chapter 11 case was filed in bad faith. In all cases, however, these factors are not to be applied mechanically, and courts consider "the entire view of the facts and circumstances—no one factor is determinative." *AAGS Holdings*, 608 B.R. at 382.[7]

The parties disagree about who bears what burden on motions to dismiss for cause. Debtors contend that the moving party has the burden of establishing cause, and, further, observe (as FitzWalter seemingly accepts) that bankruptcy judges have "wide discretion" to determine whether cause exists. [*See, e.g.*, Hearing Tr. at 56:1–58:7, 218:5–15; *In re BH S & B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) ("[t]he moving party has the burden of demonstrating cause for dismissal") (citing *In re Loco Realty Corp.,* No. 09–11785(AJG), 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009))]. FitzWalter counters that, at least if the issue is whether the petition was filed in good faith, the movant bears the initial burden to make a *prima facie* showing to support the allegation of bad faith, but, if the movant does so, the ultimate burden rests on the

---

[7] Where the Court does find cause, it must determine whether dismissal or conversion (or appointment of a trustee) is in the best interest of creditors and the estate, considering various factors that relevant case law identifies. *Id.*; *BH S & B Holdings*, 439 B.R. at 346–47.

petitioner to demonstrate good faith. [Motion at 14–15 (citing *In re Syndicom Corp.*, 268 B.R. 26, 47 (Bankr. S.D.N.Y. 2001)); *see, e.g.*, 7 Collier ¶ 1112.04]. In light of the findings of fact set forth above, even assuming that FitzWalter has made a *prima facie* showing of bad faith and that the burden has shifted to Debtors, Debtors have made a showing that more than meets the burden that FitzWalter contends they bear.

Neither "cause" for dismissal nor "subjective bad faith" has been shown here. First, there is no "objective futility of the reorganization process," an overarching consideration if not a required state of affairs for dismissal to be warranted under *In re Kingston* and *In re AAGS Holdings*. To the contrary, Debtors are seeking to proceed as expeditiously as possible with a sale that will satisfy all claims and, they say, will even generate a recovery for equity holders. The potential viability of that course is confirmed by multiple considerations beyond Debtors' say-so: First, the existence and Debtors' energetic pursuit of prompt approval of the Stalking Horse Bidder and the parties' negotiated Term Sheet, and, second, the opposition to FitzWalter's Motion and support of Debtors' sale efforts from two holders of secured debt, and from JPL. [ECF Nos. 51, 54, 55]. Further, the Court credits JPA's showing that the solution it is pursuing in this Court is likely to be more protective of all parties in interest than will FitzWalter's effort to exercise its contractual rights elsewhere, especially given FitzWalter's asserted (and undisputed) lack of fiduciary duties to other affected parties, the credible testimony of Mr. Loechteken that a sale of disaggregated assets very likely will be less lucrative than an all-asset sale, and JPA's showing at the hearing that FitzWalter has already asserted entitlement to $2.4 million in professional expenses as part of its entitlements under the Security Agreements. Further, it cannot be seriously contended that an expedited sale process aimed at fully compensating all parties in interest is an "objectively futile" use of bankruptcy processes, whether the ultimate post-sale outcome will be

some form of liquidation (as the Court suspects is likely), or a reorganization of the remaining post-sale Debtor entity and any assets it may retain. *See, e.g.*, *In re Soundview Elite, Ltd.*, 503 B.R. 571, 580 (Bankr. S.D.N.Y. 2014) ("it is not bad faith to file a chapter 11 petition for the purpose of a more orderly liquidation") (citing 6 Collier ¶ 1112.07[6][b][i]); *In re Crown Vill. Farm, LLC*, 415 B.R. 86, 92–93 (Bankr. D. Del. 2009) ("[a] proper bankruptcy purpose" in a Chapter 11 case evidencing good faith "includes maximizing the value of the debtor's sole asset as is the case here where the Debtor will market the [Property] and subject it to an auction process for sale to the highest and best bid").

FitzWalter emphasizes that many of the *C-TC* factors that characterize bad-faith filings of single-asset debtors are present here, and JPA emphasized its overarching good faith more than it debated the applicability of specific *C-TC* factors. The Court nevertheless concludes that not every *C-TC* factor is met, and, particularly because it finds that JPA's intended course of action appears potentially viable and protective of all parties in interest, the Court concludes in weighing the *C-TC* factors that Debtors did not file their petitions in bad faith.

Proceeding in numerical order through the factors (*see In re C-TC*, 113 F.3d at 1311), the Court finds:

Factor 1 – the debtor has only one asset – is largely but not entirely satisfied. The Debtors in substance are one-asset concerns that each owns a physical asset (here, an airplane) and associated lease and contract rights. However, as of the Petition Date, FitzWalter was pursuing foreclosure of the Lease Assets but not the aircraft, demonstrating that Debtors' assets can be disaggregated and conveyed in constituent parts.

Factor 2 – the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors – is satisfied here. Secured creditors are owed something in the neighborhood of $200 million, with the exact amount in apparent dispute; Debtors list almost no unsecured creditors with specific amounts owed. Debtors' largest listed unsecured claim is for less than $2 million, and belongs to JPA's parent, JPL.

Factor 3 -- the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt – is not met according to the literal terms of this test. The Lease Assets are subject to a foreclosure action by FitzWalter, but the aircraft themselves are not.

Factor 4 – the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action – is correctly disputed by JPA. Two secured creditors and JPL have all filed statements opposing the Motion and supporting the proposed Section 363 sale. Nor will all parties' disputes be resolved by the "pending" foreclosure action in England, because that action (or non-judicial foreclosure process) concerns the Lease Assets but not the aircraft.

Factor 5 – the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights – is satisfied. It is true (and explicitly conceded) that Debtors' filings were motivated by a desire to stop FitzWalter's foreclosure efforts, and instead to bring about what Debtors consider a value-maximizing approach through a sale supervised by this Court. However, courts recognize that the mere fact that a debtor files for bankruptcy protection even on the eve of a foreclosure does not alone evidence bad faith or an improper application of the bankruptcy laws. *See In re Cohoes*, 931 F.2d at 228 ("there is a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and

the concept of abuse of judicial process"); *In re AAGS Holdings*, 608 B.R. at 383 (same (quoting *Cohoes*)).

Factor 6 – the debtor has little or no cash flow – is satisfied here, particularly after FitzWalter terminated the leases and directed that payments be made directly to secured lenders.

Factor 7 – the debtor can't meet current expenses including the payment of personal property and real estate taxes – has not been shown to apply here, because the JPA Debtors do not have payroll or other fixed expenses, and so cannot be said not to be meeting those expenses. Meanwhile, no evidence has been shown to the Court suggesting that Debtors are administratively insolvent, and they appear able to meet their legal expenses, at least in part due to the retainers that have been deposited for that purpose.

Factor 8 – the debtor has no employees – is satisfied here.

Thus, in sum, the Court finds that the third, fourth, and seventh *C-TC* factors are not satisfied here, while the first (to a qualified extent), second, sixth, and eighth are satisfied. The fifth is satisfied but its significance is limited given case law recognizing that a filing immediately before a foreclosure, even for the purpose of avoiding a foreclosure, is not necessarily an improper or bad-faith use of the bankruptcy laws.

Whatever the one-by-one tally of *C-TC* factors reveals, however, the totality of the record before the Court gives an overwhelming impression of a good-faith effort to use bankruptcy remedies to achieve a superior outcome for all parties in interest—with the possible exception of FitzWalter, which stands to be fully paid (with the possible exception of certain disputed amounts beyond principal and interest) on account of its secured debt if the bankruptcy sale goes forward, but which may lose profit it could otherwise achieve if its own foreclosure process allows it to

emerge with lower-cost ownership of JPA's valuable assets. Again, courts are "not to apply [the *CT-C*] factors mechanically," but must "consider the entire view of the facts and circumstances." *In re AAGS Holdings*, 608 B.R. at 383 (cleaned up) (quoting *In re 68 W. 127th St. LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002), and citing *In re Encore Prop. Mgmt. of W. New York, LLC*, 585 B.R. 22, 30 (Bankr. W.D.N.Y. 2018)). Thus, as was the case in *In re AAGS Holdings*, the Court concludes that, whatever the *C-TC* factors may suggest, "the totality of the circumstances show that Debtor[s] ha[ve] not filed . . . in bad faith but instead, ha[ve] properly invoked a protection provided for in the Bankruptcy Code to pay [their] creditors" and reorganize or liquidate through legally available provisions of the bankruptcy laws. 608 B.R. at 384. Debtors have done so in a manner that is not objectively futile and that evinces their good faith.

Two cases that FitzWalter emphasizes merit discussion. First, FitzWalter argues that this case is controlled by *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576 (Bankr. S.D.N.Y. 2018), which dismissed an involuntary bankruptcy petition filed by certain creditors for cause because the Court found the petition to be an attempt to force an accelerated liquidation for the petitioning creditors' "own benefit at the expense of the larger creditor community," in contravention of "the prime bankruptcy policy of equality of distribution among creditors." 594 B.R. at 604 (quoting *In re Murray*, 543 B.R. 484, 495 (Bankr. S.D.N.Y. 2016)). FitzWalter is correct that a number of *C-TC* factors were present in *Taberna* in ways that parallel JPA's case. That is immaterial, however, because the overarching consideration that drove the dismissal for cause in *Taberna* was the petitioning creditors' attempt to game the bankruptcy system to force an outcome that would disproportionately benefit them at the unjust expense of other parties in interest—a description that, if anything, fits FitzWalter's approach here more than it does Debtors'.

Second, FitzWalter argues that dismissal is mandated by *In re Loco Realty Corp.*, No. 09-111785 (AJG), 2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009), which dismissed a bankruptcy case for cause where the debtor's proposed plan depended on rent revenues that it had alienated and that were not property of the estate to fund the plan, such that "the prospects of reorganization for Debtor are unrealistic" and the debtor "ha[d] no realistic chance of successfully emerging from bankruptcy." *Id.* at *5. Were FitzWalter correct that the limitations on Debtors' property rights precluded their proceeding with their contemplated Section 363 sale, *In re Loco* would indeed support dismissal here. But, as explained above, Debtors here retain sufficient property interests to go forward with their contemplated sale, or, at a minimum, it cannot be said that there is "no realistic chance" of their doing so.

## IV.    Abstention Under Section 305 Is Not Warranted

Section 305(a)(1) of the Bankruptcy Code authorizes a bankruptcy court to dismiss or suspend all proceedings in a bankruptcy case under any chapter if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). Courts have held that abstention under Section 305 is "an extraordinary remedy" appropriate only "where the court finds that both creditors and the debtor would be better served by a dismissal." *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *5 (Bankr. E.D.N.Y. Sept. 27, 2010). The burden to demonstrate that the interests of the debtor and its creditors would benefit from dismissal lies on the moving party. *Id.* Courts in this Circuit have identified factors relevant to this inquiry: (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5)

whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought. *Id.*

FitzWalter has not carried its burden to demonstrate the necessity of this "extraordinary remedy." The fact that there is no proceeding pending elsewhere seeking to foreclose upon or determine parties' entitlements to the aircraft (as opposed to the Lease Assets) shows or at least strongly suggests that the first, second, and fourth factors are not met here. The Court's factual findings set forth above suggest that these proceedings provide a federal forum that is, at a minimum, a potentially viable means to "a just and equitable solution" as called for by the third factor. And the sixth factor is not met because there is no advanced non-federal insolvency proceeding, but merely a nascent English foreclosure process that was underway for roughly one week before the Petition Date as to the Lease Assets, and no foreclosure proceeding pending as to the aircraft. Finally, as held above, the "purpose for which bankruptcy jurisdiction has been sought" has not been shown to be either subjectively in bad faith, or clearly meritless or incapable of a successful bankruptcy resolution—particularly in light of non-Debtors' support for Debtors' position and their opposition to the Motion. Accordingly, the Court cannot conclude that both creditors and Debtors would be better served by a dismissal, and, so, the Motion's alternative request for abstention is denied.

## CONCLUSION

For the reasons stated above, the Motion is DENIED.

The parties are to promptly contact chambers to schedule a continuation of the hearing on Debtors' pending motion for approval of proposed bidding procedures and related relief in connection with their contemplated Section 363 sale.

IT IS SO ORDERED.

Dated: New York, New York
February 1, 2022

_____*s/ David S. Jones*_____
Honorable David S. Jones
United States Bankruptcy Judge